65 F.3d 784
 95 Cal. Daily Op. Serv. 7196, 95 Daily Journal
D.A.R. 12,293
Lynn HERVEY, individually and as guardian of Monica Hervey;
Tim Hervey; Debbie Couch Emery, individually and
as guardian of Ken Emery and Melissa
Emery, Plaintiffs-Appellants,
v.
Coral ESTES; Tom Lind; Pierce County; Pierce County
Sheriff's Department; Tahoma Narcotics
Enforcement Team; et al., Defendants-Appellees.
 No. 94-35445.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 11, 1995.
Decided Sept. 12, 1995.
As Amended on Denial of Rehearing and Suggestion for
Rehearing En Banc Dec. 5, 1995.
 
 Timothy K. Ford and Frederick L. Noland, MacDonald, Hoague & Bayless, Seattle, WA, for plaintiffs-appellants.
 Loretta M. Lamb, Assistant Attorney General, Seattle, WA, for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before: BEEZER and HAWKINS, Circuit Judges, and TEVRIZIAN, District Judge.*
 BEEZER, Circuit Judge:
 
 
 1
 Law enforcement officers conducted a military-style raid to search for a methamphetamine laboratory on rural property in Pierce County, Washington. We decide whether a warrant affidavit procured in part through false statements contained sufficient untainted information to support the existence of probable cause. We also address whether plaintiffs may maintain a suit against an intergovernmental task force for its alleged use of excessive force in carrying out the raid, and against an individual officer for her alleged use of excessive force during the raid.
 
 
 2
 The district court granted summary judgment in favor of defendants on all claims. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291. We reverse in part, affirm in part, and remand for further proceedings.
 
 
 3
 * In May of 1990, Washington State Patrol Detective Coral Estes began an investigation into a suspected methamphetamine laboratory on the Hervey property in Pierce County. Estes was working in conjunction with the Tahoma Narcotics Enforcement Team ("TNET"), an intergovernmental task force made up of various local, county and state agencies with authority to investigate suspected drug operations. After completing various information gathering, including speaking to informants, flying over the suspect property, and talking to various officers who had visited the property, Estes signed an affidavit for a search warrant.
 
 
 4
 The warrant affidavit contained the following facts. Estes met with an anonymous citizen informant who relayed that a second anonymous informant knew of a person who was suspected of manufacturing controlled substances in a clandestine laboratory. The first informant described Michael Hervey's residence and relayed that the second informant had detected strong chemical odors "described as Acetone." Estes met with the second informant and confirmed these observations. The second informant also indicated to Estes that United Parcel Service made frequent deliveries to the residence, Hervey used vehicles to block the driveway, and Hervey possessed a firearm.
 
 
 5
 Estes flew over the subject property and observed three large drums. In her "experience and training" Estes knew that chemicals used in methamphetamine manufacturing were transported in large drums. Estes also observed vehicles parked in the driveway.
 
 
 6
 On July 20, Deputies Riehl and Maye of the Pierce County Sheriff's Office responded to a call from Hervey on an unrelated matter. When they arrived at the property, Deputy Riehl heard a portable generator running. Michael Hervey approached them with "white powder on his lips, in his nostral [sic] hairs, and on his hair." According to Estes' affidavit, Deputy Riehl "could smell an odor of cat urine or P2P (a precursor chemical to the manufacture of Methamphetamine) about [Hervey's] person." Deputy Riehl also "noticed an odor of acetone coming from one of the vehicles parked in the driveway." Finally, Deputy Riehl "recognized the odors that are consistent with the manufacturing of Methamphetamine based upon his training and experience."
 
 
 7
 Finally, Estes' warrant affidavit described Deputy Riehl's background in law enforcement. Deputy Riehl completed courses in "Narcotics and Dangerous Drug [sic] for Law Enforcement" and attended the "Clandestine Laboratory Safety Training." The affidavit also indicated that Deputy Riehl was "certified" as a Narcotics Investigator and in Clandestine Laboratory Investigation.
 
 
 8
 Estes presented the affidavit to Pierce County Superior Court Judge Buckner. On July 20, 1990, Judge Buckner issued a search warrant authorizing law enforcement officers to search the "residence of Michael W. Hervey" together with "outbuildings and vehicles located on said premises."TNET prepared to execute the warrant on July 23, 1990. A surprise raid was planned largely because of the possible danger involved in executing warrants at clandestine drug laboratories. Deputy Sheriff Thomas Lind, one member of the entry team, described the "standard garb" worn by members of the team:
 
 
 9
 I had a 9mm sidearm in a holster, and a submachine gun with a suppressed muzzle to decrease the chance of an explosion if it were fired in the volatile atmosphere of a drug lab. I was wearing a black fire-retardant Nomex suit, boots, gloves and hood, and a heavy ballistic vest over that clothing. I was also wearing a full-face respirator mask which had a speaking diaphragm built into it.
 
 
 10
 The participants lured Michael Hervey off the property and entered the property secretly, but the element of surprise quickly vanished. Two children on the property spotted the well-armed, strangely dressed team and began yelling. Deborah Couch, Tim Hervey's fiancee, stepped out of a trailer and also began screaming. Eventually, all occupants on the premises were "assist[ed] ... to the ground" by members of the TNET entry team. Lynn Hervey objected to the assistance provided to her, contending that Detective Estes used unreasonable force.
 
 
 11
 No methamphetamine laboratory was discovered on the property. The entry team did, however, discover a small marijuana growing operation. Michael Hervey was subsequently prosecuted for, and pleaded guilty to, possession of marijuana.
 
 
 12
 Michael Hervey's wife, Lynn Hervey, joined by the other plaintiffs, brought a section 1983 action against various individual police officers, Pierce County, the Pierce County Sheriff's Office, and TNET. Hervey alleged in her complaint that Estes obtained the search warrant through an affidavit containing false and misleading information. Among other factual inaccuracies, Hervey contended that Riehl had not told Estes that he smelled P2P or Acetone, and that Riehl was not certified in narcotics investigation or clandestine laboratory investigation. Hervey further alleged that the police officers and agencies involved used excessive force in the execution of the warrant, making the search an unreasonable one under the Fourth Amendment.
 
 
 13
 The district court initially granted partial summary judgment to various defendants, dismissing all claims against Pierce County, the Pierce County Sheriff's Office and TNET on grounds that these entities were "shielded from liability by qualified immunity of the individuals involved and the lack of an available respondeat superior liability. They are further shielded by the failure of plaintiffs to show any official municipal policy, practice, or custom, or a failure to train." The district court also dismissed Hervey's claim regarding the use of excessive force by all defendants in carrying out the search, concluding that "in the manner of conducting the search, all parties are protected by qualified immunity...." Hervey's claim against Estes for procuring the warrant through the use of false and misleading statements remained alive, albeit temporarily.[1]
 
 
 14
 On February 23, 1994, the trial court asked all parties to produce redacted search warrant affidavits reflecting their version of what the facts at trial would show were the material facts known to Estes. Both sides submitted their versions of the affidavit.
 
 
 15
 On the day scheduled for trial, the district court orally dismissed Hervey's claim against Estes. The court reviewed the competing versions of the affidavit and concluded, "I think the defendants are much more accurate and reasonable than the plaintiffs." After discussing what the affidavit would contain without the improperly included material, the court stated, "I think this warrant application, while not a hundred percent accurate, was not substantially misleading or unfairly misleading.... The magistrate could have issued the warrant, even without the information that is here attacked, and even with the addition of the information that the plaintiff thinks should be added." Finally, the district court concluded that "I think, in addition to [its conclusion that the redacted affidavit supported probable cause], after this study of the whole thing, that Officer Estes is protected on this issue by qualified immunity."
 
 
 16
 Hervey appeals the district court's rulings on all claims against Estes, and the claim against TNET.
 
 II
 
 17
 We review de novo the district court's grant of summary judgment. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). We also review de novo the application of qualified immunity. White by White v. Pierce County, 797 F.2d 812, 815 (9th Cir.1986).
 
 III
 
 18
 Hervey argues that the district court erred by granting summary judgment in Estes' favor on the claim that Estes procured the search warrant through false statements. Hervey contends that she was erroneously denied her right to have a jury decide whether Estes made materially false or misleading statements in the search warrant affidavit, and that even if the issue was appropriately decided by the court, it erred in its determination that the redacted affidavit supported issuance of the warrant.
 
 
 19
 * The parties vigorously dispute what law should be applied when false information is alleged to be included in a warrant affidavit, and whether the court or a jury should apply it. In Branch v. Tunnell, 937 F.2d 1382, 1387 (9th Cir.1991), we set forth the principles under which Hervey's action will be considered.[2]
 
 
 20
 In Branch, a plaintiff brought a Bivens action against a federal officer, alleging that the officer deliberately submitted inaccurate information in a search warrant affidavit in order to search the defendant's home and office.[3] We held that the standard for qualified immunity in a civil rights action of this type was governed by Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Franks established a criminal defendant's right to an evidentiary hearing when he made a substantial showing of deliberate falsehood or reckless disregard for the truth in a search warrant affidavit and demonstrated that but for the dishonesty, the affidavit would not support a finding of probable cause. Id. at 171-72, 98 S.Ct. at 2684-85.
 
 
 21
 In a civil rights case, "if an officer 'submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, ... he cannot be said to have acted in an objectively reasonable manner,' and the shield of qualified immunity is lost." Branch, 937 F.2d at 1387 (quoting Olson v. Tyler, 771 F.2d 277, 281 (7th Cir.1985)); see Franks, 438 U.S. at 171-72, 98 S.Ct. at 2684-85. We established a heightened pleading standard for a plaintiff to establish that the defendant knowingly or recklessly misled the magistrate. Branch, 937 F.2d at 1387.
 
 
 22
 We noted that even if the plaintiff met this heightened pleading standard in a complaint, the plaintiff must satisfy a still higher standard to survive summary judgment. The plaintiff "alleging judicial deception 'must make a substantial showing of deliberate falsehood or reckless disregard for truth' and 'establish that, but for the dishonesty, the challenged action would not have occurred.' " Branch, 937 F.2d at 1388 (quoting Snell v. Tunnell, 920 F.2d 673, 698 (10th Cir.1990), cert. denied, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991)). If a plaintiff survives the summary judgment phase, the matter should go to trial.
 
 
 23
 In sum, a plaintiff can only survive summary judgment on a defense claim of qualified immunity if the plaintiff can both establish a substantial showing of a deliberate falsehood or reckless disregard and establish that, without the dishonestly included or omitted information, the magistrate would not have issued the warrant. Put another way, the plaintiff must establish that the remaining information in the affidavit is insufficient to establish probable cause. The showing necessary to get to a jury in a section 1983 action is the same as the showing necessary to get an evidentiary hearing under Franks. See Snell v. Tunnell, 920 F.2d 673, 698 (10th Cir.1990), cert. denied, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991).
 
 
 24
 Hervey initially argues that a claim of qualified immunity is defeated simply by a showing of deliberately false or misleading statements. Although a well-reasoned argument, it is not the law of this circuit. Branch, 937 F.2d at 1388. Hervey must establish both a substantial showing of the deliberate falsity or reckless disregard of the truth of the statements in the affidavit and the materiality of those statements to the ultimate determination of probable cause.
 
 
 25
 Hervey also argues that a jury should determine whether the affiant's false statements were material; in other words, could the magistrate have issued the warrant in the absence of the contested statements. At the summary judgment stage on the issue of qualified immunity, however, Hervey is not correct.[4] Although the practical effect of this rule is to reserve to the court the issue of the materiality of the false statements, that is the result of our decision in Branch. 937 F.2d at 1388 (at summary judgment stage, plaintiff must "establish that, but for the dishonesty, the challenged action would not have occurred.") (emphasis added). In any case, the question of qualified immunity is normally one for the court. See Hunter v. Bryant, 502 U.S. 224, 227-28, 112 S.Ct. 534, 536-37, 116 L.Ed.2d 589 (1991). It is only objectively unreasonable for a law enforcement officer to deliberately or recklessly misstate facts material to the probable cause determination.[5] This rule conserves judicial resources by allowing trials (or Franks hearings in the criminal context) only where the officer's behavior has an effect on the ultimate issue--would the warrant still have been issued.
 
 B
 
 26
 Having set forth the standard, we apply it to the facts of this case. The district court properly required that both parties submit redacted versions of the search warrant affidavit. Hervey contends that the district court erred in adopting the defendant's version of the affidavit. We disagree. The district court excised those facts that Hervey had demonstrated through a substantial showing of evidence were falsely included in the affidavit. Hervey is not entitled to rewrite the affidavit to her liking. There was no error on this issue.
 
 
 27
 We have no doubt that Hervey has made the required substantial showing that Estes made deliberately false statements or recklessly disregarded the truth in the affidavit. Hervey specified precisely what portions of the affidavit were false, and supported her claim with documentation. Hervey presented depositions from Deputy Riehl that he was not "certified" in Narcotics Training or Clandestine Laboratory Investigation, as the affidavit purported. More importantly, Riehl indicated that he did not tell Estes that he smelled "acetone" or "P2P" when he was on the Hervey property; indeed he stated that he had no knowledge of the smell of these chemicals.
 
 
 28
 The remaining question is whether given the remaining information in the affidavit, Hervey has established that the magistrate would not have issued the search warrant, i.e. that probable cause was absent. We believe that she has. The falsely included facts constituted the entire substance of the affidavit. Absent the false information, a neutral magistrate would not have issued the warrant because there was no probable cause to believe a crime had occurred. On this question, we disagree with the district court.
 
 
 29
 A brief review of the remaining material in the affidavit is enlightening. The affidavit contains uncorroborated anonymous informant information of an "acetone" smell, parcel deliveries to the property, and vehicles blocking a driveway. Unproven, uncorroborated and unreliable informant information is entitled to no weight in Washington, which still adheres to the Aguilar- Spinelli test for determining the reliability and credibility of informant information. State v. Jackson, 102 Wash.2d 432, 688 P.2d 136, 141-43 (1984). Estes' testimony that Hervey had three large drums on the property is by itself unremarkable.
 
 
 30
 Shorn of the false information about what Deputy Riehl smelled and his qualifications to do so, the Deputy's observations while on the property do not establish probable cause, either alone or in combination with the rest of the affidavit. His observations of white powder on Hervey and the operation of a generator are not tied in any way to the manufacture of methamphetamine. They are irrelevant. Riehl's statement that he smelled cat urine and later "recognized the odors that are consistent with the manufacturing of Methamphetamine," are far too vague to support probable cause. Deputy Riehl's observation lacks any factual basis or support. The specific "odors" referred to in the initial affidavit, acetone and P2P, were falsehoods, and Deputy Riehl denied even knowing what acetone or P2P smelled like. A neutral magistrate could not possibly credit the Deputy's broad statement that he smelled "odors that you'd find at a methamphetamine lab" without knowing more about what those odors were or why and how Riehl was trained to recognize them. That information is lacking in this affidavit. Indeed, the unredacted affidavit fails to indicate that Deputy Riehl is trained at all in the detection of the odors of methamphetamine laboratories or associated chemicals. Cf. United States v. DeLeon, 979 F.2d 761, 764 (9th Cir.1992) (smell can justify issuance of a warrant if person who detected it "is qualified to detect the odor of the substance.").
 
 C
 
 31
 While we recognize that our focus at the summary judgment stage on qualified immunity is directed to whether the remaining information supports a finding of probable cause, not to the details of the false information, we cannot help but comment on the importance of the false information contained in this warrant affidavit. Estes' imputing of terms such as "acetone" and "P2P" to Deputy Riehl made the affidavit substantially more plausible to Pierce County Superior Court Judge Buckner. Given the reliance that both federal and Washington courts place on an experienced officer's perceptions of sight, smell, and sound, the deliberately false or reckless inclusion of those perceptions is unforgivable. Often, an officer's sworn testimony that he smelled marijuana or another controlled substance is sufficient, in and of itself, to justify issuance of a warrant. See DeLeon, 979 F.2d at 765 (citing cases from this and other circuits for the proposition that smell alone by an experienced officer can support probable cause); State v. Olson, 73 Wash.App. 348, 869 P.2d 110, 114 ("[w]hen an officer who is trained and experienced in marijuana detection actually detects the odor of marijuana, this by itself provides ... probable cause justifying a search."), review denied, 124 Wash.2d 1029, 883 P.2d 327 (1994). Courts must be exceptionally vigilant when officers fabricate these perceptions. Estes' conduct is even more outrageous in this case, where the warrant issued was used to conduct a full-scale assault on the Hervey's property. Such a dramatic intrusion on property and privacy must not be tainted by such material falsehoods as those included by Estes in the affidavit.
 
 
 32
 We reverse summary judgment in favor of Estes, and remand the case for trial. Estes is not entitled to qualified immunity in this case because her conduct was not objectively reasonable, indeed it was thoroughly unprofessional. At trial, Hervey will have to convince a jury that Estes deliberately or recklessly included the false statements in the affidavit. That is a factual determination for the trier of fact.
 
 IV
 
 33
 We also reverse and remand Hervey's excessive force claim against Detective Estes. Unreasonable force claims are generally questions of fact for a jury. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir.1991), cert. denied, 505 U.S. 1206, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992). Qualified immunity was not properly granted on this claim.
 
 V
 
 34
 Hervey also appeals the district court's grant of summary judgment to TNET on her claim that the manner of execution of the warrant was unreasonable under the Fourth Amendment. The district court concluded that TNET was protected by the qualified immunity of the individuals involved, the lack of respondeat superior liability, and Hervey's failure to show an official policy or practice. We agree with the district court's conclusion, but for an entirely different reason.
 
 
 35
 Section 1983 applies to the actions of "persons" acting under color of state law. It is beyond dispute that a local governmental unit or municipality can be sued as a "person" under section 1983. Monell v. Department of Social Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). Governmental units may not assert the good faith of their officers or employees as a defense to liability under section 1983. Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). The district court therefore erred by granting summary judgment to TNET on grounds of qualified immunity.
 
 
 36
 Although the district court correctly stated that a governmental entity is not subject to respondeat superior liability for actions of its officers under section 1983, Monell, 436 U.S. at 694, 98 S.Ct. at 2037-38, liability may attach if an employee commits an alleged constitutional violation "pursuant to a formal governmental policy or a 'longstanding practice or custom which constitutes the standard operating procedure....' " Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir.1992), cert. denied, --- U.S. ----, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993). We agree with Hervey that TNET had formal policies and procedures for conducting raids on suspected methamphetamine laboratories. Indeed, Detective Estes testified that the raid in this case was typical of all TNET raids.
 
 
 37
 Despite our disagreement with the district court's rationale, we reach the same conclusion because, in our judgment, TNET is not a "person" or an entity subject to suit under section 1983. TNET is composed of several local, county, and state governmental entities, including the Tacoma Police Department, the Sumner Police Department, the Pierce County Sheriff's Office, the Pierce County Prosecutor's Office and the Washington State Patrol.
 
 
 38
 Hervey did not sue the component members of TNET; rather, she sued TNET as a separate legal entity. TNET is not a municipality or local governmental entity, it is an intergovernmental association. It is only subject to suit if the parties that created TNET intended to create a separate legal entity. See Timberlake by Timberlake v. Benton, 786 F.Supp. 676, 682-88 (M.D.Tenn.1992) (proper examination is whether "the parties to this mutual aid agreement created a separate legal entity."); Maltby v. Winston, 36 F.3d 548, 560 n. 14 (7th Cir.1994) (examining whether state law creating intergovernmental task force indicated desire to subject task force to suit), cert. denied, --- U.S. ----, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995). Hervey provided insufficient evidence that the entities that created TNET intended to create a separate legal entity subject to suit.
 
 
 39
 The evidence in the record indicates precisely the opposite; the entities that created TNET did not envision a separate legal entity. See Wash.Rev.Code Sec. 39.34.030 (West 1995). Under Washington law, public agencies entering into an agreement for joint or cooperative action may, but need not, establish a separate legal entity. The important determinant is what the parties set forth in their joint operating agreement. Here, the agreement does not contemplate a separate legal entity.
 
 
 40
 TNET does not have an operating budget as an independent entity. Its member entities retain responsibility for the employment, salary, benefits, and terms and conditions of all employees. Finally, the Agreement creating TNET, signed by all member entities, provides that "[f]or the purposes of indemnification of the unit personnel and their participating jurisdictions against any losses, damages, or liabilities arising out of the services or activities of the unit, the personnel so assigned by any jurisdiction shall be deemed to be continuing under the employment of that jurisdiction and its policing department."
 
 
 41
 Hervey cites two cases to support her argument that TNET is an entity amenable to suit under section 1983. Instead, these cases support the opposite conclusion. In Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 401 n. 20, 99 S.Ct. 1171, 1177 n. 20, 59 L.Ed.2d 401 (1971) and Peters v. Delaware River Port Authority, 16 F.3d 1346, 1349-52 (3d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 62, 130 L.Ed.2d 20 (1994), the Supreme Court and Third Circuit respectively concluded that intergovernmental agencies were entities subject to suit. In both cases, however, the agencies were created or approved by acts of state legislatures. TNET has no such pedigree. The agreement creating TNET does not indicate from what authority it springs. Absent some indication from either state law or from the enabling document that anyone intended TNET to be a formal independent entity, such as the entities in Tahoe and Peters, we conclude that it is not an entity subject to suit under section 1983. The district court correctly dismissed TNET from the action.
 
 
 42
 We caution that TNET's actions are not beyond judicial review. If, as the record indicates, TNET is designed to function as an informal association of various governmental entities setting joint policies and practices for conducting drug investigations and raids, its component members may be sued and may be subject to joint and several liability for any constitutional violations. We recognize that further issues may arise, such as whether the Washington State Patrol, a state agency, may be subject to liability for damages under section 1983, but we need not address them in the context of the record on appeal.
 
 VI
 
 43
 Both sides seek attorney fees pursuant to 42 U.S.C. Sec. 1988 in the event they are prevailing parties. Estes is not a prevailing party. We decline to award fees to TNET. Hervey is not yet entitled to attorney fees under section 1988 because she has not yet prevailed on a claim. Hanrahan v. Hampton, 446 U.S. 754, 757-58, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). Section 1988 does not provide for attorney fees when a party merely establishes a right to trial. Cooper v. Dupnik, 963 F.2d 1220, 1252 n. 13 (9th Cir.) (en banc), cert. denied, --- U.S. ----, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992).
 
 
 44
 REVERSED IN PART, AFFIRMED IN PART, and REMANDED for further proceedings.
 
 
 
 *
 The Honorable Dickran M. Tevrizian, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 The district court also denied summary judgment on one of Tim Hervey's claims against an individual deputy and one of Lynn Hervey's claims against another individual deputy. The plaintiffs have voluntarily dismissed their claims against these individual defendants. We will not address them
 
 
 [2]
 Hervey's citation to Morgan v. Woessner, 997 F.2d 1244 (9th Cir.1993), cert. dismissed, --- U.S. ----, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994) is not helpful because that case involved a claim of qualified immunity in the context of an unconstitutional seizure of a person in an airport. Once the court determined that probable cause was objectively lacking, and that the law was clearly established, the inquiry was at an end. Id. at 1260
 
 
 [3]
 Although Branch involved a Bivens action against a federal officer, see Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), its analysis is also applicable to section 1983 actions against state officers. See Branch, 937 F.2d at 1387
 
 
 [4]
 The Supreme Court's recent opinion in United States v. Gaudin, --- U.S. ----, ----, 115 S.Ct. 2310, 2320, 132 L.Ed.2d 444 (1995), is inapposite. The Court held that a criminal defendant has the right to have a jury determine the materiality of a false statement because materiality was an element of the crime. Gaudin is not applicable to a civil proceeding
 
 
 [5]
 Hervey cites various out of circuit cases that she argues support her contention that the jury must decide both the falsity of the statements and their materiality. Hindman v. City of Paris, Texas, 746 F.2d 1063, 1067-68 (5th Cir.1984) holds only that a jury must decide the "issue of the officers' truthfulness and intent at the time they applied for the warrant." In that case, a trial had already occurred, so questions of summary judgment and qualified immunity were not at issue. Hill v. McIntyre, 884 F.2d 271, 275-76 (6th Cir.1989), provides better support for Hervey. The Sixth Circuit held that "the question whether the judicial officer issuing the warrant would have done so even without the knowingly or recklessly false statement is one for the jury." Id. We reject that procedure when a police officer claims qualified immunity. In Branch, we set forth the summary judgment standard for qualified immunity claims in this area, and that standard indicates that materiality must first be found by the court before the case can go to a jury. Finally, the Second Circuit, in Velardi v. Walsh, 40 F.3d 569, 573-74 (2d Cir.1994), held that summary judgment is inappropriate in "doubtful cases" where the court is unsure what weight a neutral magistrate would give the remaining truthful information. The Second Circuit did not determine Velardi to be one of those doubtful cases, granting summary judgment on qualified immunity grounds to defendants. The Velardi court also observed, in a footnote, that a review of whether a magistrate would issue a warrant based on the remaining truthful information is a "question of fact rather than of law." 40 F.3d at 574 n. 1. We do not believe that is the law of this circuit, where Branch indicates that we must make a determination whether, in the absence of the false statements, the magistrate would not have issued the warrant. That question is for the court