**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAVIER BRAVO, SR.; HOPE BRAVO;
E. B., a minor by her Guardian ad
Litem Sara Gonzales,
                    *Plaintiffs-Appellants,*

                v.

CITY OF SANTA MARIA; DANNY R.
MACAGNI, Santa Maria Police
Chief; LOUIS TANORE, Santa Maria
Police Detective; LARRY RALSTON,
Santa Maria Police Lieutenant;
COUNTY OF SANTA BARBARA; SANTA
BARBARA COUNTY SHERIFF'S
DEPARTMENT; JIM ANDERSON, Santa
Barbara County Sheriff; DON
PATTERSON, Santa Barbara County
Commander,
                    *Defendants-Appellees.*

No. 09-55898

D.C. No.
2:06-cv-06851-
FMC-SH

OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
May 5, 2011—Pasadena, California

Filed December 9, 2011

20909

Before: Stephen Reinhardt and Michael Daly Hawkins,
Circuit Judges, and Brian M. Cogan, District Judge.*

Opinion by Judge Hawkins

---

*The Honorable Brian M. Cogan, United States District Judge for the
Eastern District of New York, sitting by designation.

## COUNSEL

Donald W. Cook (argued), and Robert Mann (briefed), Los Angeles, California, for the plaintiffs-appellants.

Richard R. Terzian (argued and briefed), Burke, Williams and Sorensen, Los Angeles, California, for defendants-appellees City of Santa Maria, Danny R. Macagni, Santa Maria Police Chief, Louis Tanore, Santa Maria Police Detective, and Larry Ralston, Santa Maria Police Lieutenant.

Jake Stoddard, Chief Deputy, and Jordan Sheinbaum, Deputy County Counsel, Santa Barbara, California, (both briefed) for defendants-respondents the County of Santa Barbara, the Santa Barbara Sheriff's Department, Sheriff Jim Anderson and Commander Don Patterson.

**OPINION**

HAWKINS, Senior Circuit Judge:

Hope Bravo and Javier Bravo Sr., along with their minor granddaughter E.B. (collectively "the Bravos"), appeal the adverse summary judgment grant in their 42 U.S.C. § 1983 action arising out of the nighttime SWAT team search of their home for weapons suspected of being used in a drive-by shooting and stored in the Bravo home by their son, Javier Bravo Jr. ("Javier Jr."). The Bravos allege their Fourth Amendment rights were violated by the issuance and execution of a search warrant whose application failed to disclose that Javier Jr. was at that time, and for over six months had been, incarcerated in the California prison system and therefore not only was not present in the Bravo home, but moreover could not have been involved in the shooting or the storage of weapons used in it. Because the Bravos presented sufficient evidence establishing a genuine issue as to whether Santa Maria Police Department ("SMPD") Detective Louis Tanore's ("Tanore") omission of this material fact was intentional or reckless, as opposed to merely negligent, we reverse the summary judgment grant in his favor and remand.

**BACKGROUND FACTS AND PRIOR PROCEEDINGS**

## I.   Background[1]

### A.   Obtaining the Warrant

The series of events that culminated in the search of the Bravo home began with the SMPD's investigation of an April 21, 2006 drive-by shooting in the unincorporated Tanglewood area of Santa Maria, California. Shots were fired from a vehicle into an occupied home, striking and injuring a young boy.

---

[1]The facts are derived, in large part, from the district court's summary judgment rulings.

SMPD Gang Suppression Team ("GST") Detectives Tanore and Eligil Lara ("Lara") were among those responsible for crime scene investigation and witness interviews. Together, they interviewed the victim and other occupants of the targeted home, learning from the witnesses that they were formerly associated with the Tangas gang and believed the shooting was, in part, a reaction to their disassociation from the gang.

Two of the witnesses recognized the car from which the shots were fired as belonging to a Tangas member and recognized a man's voice calling out from the car as that of another member. The witnesses suggested that fellow Tangas members not directly involved in the shooting would likely be storing the weapons used, as was the Tangas' customary practice. The witnesses then provided Tanore and Lara with a list of between twelve and fifteen names, including Javier Jr.'s, of alleged Tangas members believed to be closely associated with the suspected shooters.

Based on this and other information, Tanore prepared an affidavit in support of a "multiple location gang association warrant," which SMPD obtained four days later from a Santa Barbara County Superior Court Judge. The warrant was sealed for the informants' protection and authorized search of seven individuals suspected of harboring weapons and evidence relating to the drive-by shooting, as well as search of those persons' residences and vehicles, and search of any persons or vehicles present at the time of the warrant's execution. The warrant authorized the seizure of guns of the caliber used at the shooting, all other firearms, ammunition, and casings, and any indicia of gang membership. In addition, the issuing judge granted Tanore's request that the search warrant be endorsed for nighttime service "due to the severity of this investigation and the fact that the subjects involved in this investigation are all Tangas (Tanglewood) gang members," and based on Tanore's belief that "the ability to obtain the element of surprise with gang members will lessen the chance

for injury to the Officers, community, and the subjects we are searching."

Tanore's affidavit listed Javier Jr.'s address as the Bravo residence and contained a brief summary of Javier Jr.'s criminal history report, commonly known as a "rap sheet." The affidavit specifically noted Javier Jr.'s recent conviction for violation of California Penal Code § 496(A), receiving stolen property, but failed to mention that Javier Jr. had been sentenced and was over six months into serving a two-year sentence in state prison for that crime. Deposed in this litigation, Tanore admits he obtained Javier Jr.'s criminal history from his rap sheet and may have seen the two-year sentence entry, which appeared just two lines below the conviction entry, but does not recall with certainty whether he observed it or not. He further testified that, in any event, even if he had seen the sentence on Javier Jr.'s rap sheet, ordinarily it "wouldn't be something [he] would check into."

Detective Lara testified that he called the Santa Barbara County Sheriff's Office ("SBSO") substation, consistent with standard SMPD practice, to ascertain the custody status of the individuals named in the warrant application and was told by an unidentified substation employee that Javier Jr. was not in custody. Upon learning that James Franklin, another suspect originally named in the warrant application, was in custody, the officers removed his name from the application. No substation employee, however, recalls receiving such a call from Lara. Furthermore, several SBSO employees explained that their database contains only information on persons in county jail, not those in state prison, and that the only way to determine a person's state custody status is to call the state prison system's Inmate Locator number. No SMPD officer claims to have taken any other action to determine whether Javier Jr. or any of the other named individuals was in state custody at the time.

### B.   Executing the Warrant

The search warrant covered seven homes, several of which were located in Tanglewood, an unincorporated area just outside the Santa Maria city limits and patrolled by the SBSO. In order to execute the search warrant on all seven locations simultaneously, the SMPD asked the SBSO to assist with SWAT execution on two of the Tanglewood homes, including the Bravo residence. SBSO agreed to use its Special Enforcement Team, but ultimately determined it could not adequately execute the warrant simultaneously on both Tanglewood residences. SBSO therefore asked the Santa Barbara Police Department ("SBPD") SWAT team to serve the warrant on the Bravo residence and turned over all materials it had gathered in the course of scouting the mission, which included Javier Jr.'s criminal history, a record of his former encounters with SBSO, and photographs of the Bravo residence.

The SBPD SWAT team participated in final briefings the evening of April 25, 2006 and early in the morning of April 26, 2006 prior to serving the warrant on the Bravo residence. Several SBPD officers testified that they were given a detailed briefing during which they learned that Javier Jr. kept a machete, had violently resisted arrest on a previous occasion, and that thirty to forty individuals might be present in the home. No mention was made of Javier Jr.'s custody status.

After the briefing, at approximately 5:30 am, the SBPD SWAT team served the warrant. Allowing but a few seconds between announcing their presence and breaching the door, the SWAT team entered the Bravos' home by shooting off the front door locks and deploying two "flashbang" grenades, or light-sound diversionary devices, outside the back door. Mr. Bravo was sleeping in the living room and awoke to find three masked officers dressed in black, pointing their guns at him. Mrs. Bravo and then-eight-year-old E.B. awoke to the sounds of people running and screaming and ran into the bathroom for safety. An officer kicked the bathroom door open and

pointed a gun at them, shouting at them to lie flat with their stomachs on the ground. After a few minutes, an officer told Mrs. Bravo and E.B. they could get up and sit on the bed, at which point Mrs. Bravo told them her son was in jail and that they would find a recent letter from him on the dining room table. The officers then instructed Mrs. Bravo and E.B. to join Mr. Bravo in the living room.

After the SBPD SWAT team looked at Javier Jr.'s letter from prison and realized he was not present, they stopped asking for him and turned the scene over to the SMPD to conduct a search of the premises. The SMPD officers seized several items from the home, including letters from Javier Jr., photographs, and drawings that Javier Jr. had completed in prison, but no weapons. During this time, the Bravos remained detained in their living room, but at no point did the SMPD officers handcuff, strike, or touch the Bravos. At one point, Mr. Bravo began experiencing chest pains, and officers offered to call an ambulance, but Mr. Bravo did not want to leave Mrs. Bravo and E.B. alone in the house. Altogether the officers remained in the Bravos' home for approximately thirty minutes. Neither Detective Tanore nor Detective Lara were involved in the actual execution of the warrant. They learned of Javier Jr.'s custody status shortly after the warrant was executed, but Detective Lara testified in his deposition that he did not become aware that Javier Jr.'s two-year sentence was listed on his rap sheet until after this litigation began.

## II.   Procedural History

The Bravos brought suit under § 1983, § 1985, and a variety of state laws against the City of Santa Maria, Santa Barbara County, the City of Santa Barbara, and individual officers from each of the law enforcement agencies. After the City of Santa Barbara Defendants appealed on qualified immunity grounds from an adverse grant of summary judg-

ment,[2] the Bravos settled with them, and those defendants were dismissed from this suit.

On cross-motions for summary judgment, the district court granted the City of Santa Maria Defendants and the County of Santa Barbara Defendants summary judgment on all claims. The Bravos timely appealed the § 1983 claims only. The City of Santa Maria Defendants include Tanore, Santa Maria Police Lieutenant Larry Ralston ("Ralston"), Santa Maria Police Chief Denny R. Macagni ("Macagni"), and the City of Santa Maria itself. The only remaining defendants from the County of Santa Barbara are the County itself and the SBSO.[3]

## STANDARDS OF REVIEW

We review the district court's grant of summary judgment de novo. *Delia v. City of Rialto*, 621 F.3d 1069, 1074 (9th Cir. 2010). Viewing the evidence and drawing all inferences in the light most favorable to the non-moving party, we must determine whether any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law. *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). If a rational trier of fact could resolve

---

[2]The district court granted summary judgment in favor of the Bravos against the Santa Barbara police officers upon determining that the officers' forcible entry into the Bravos' home failed to comply with the knock-and-announce requirements clearly established under the Fourth Amendment and that the officers were not entitled to qualified immunity. The district court did not find *Monell* liability against the City of Santa Barbara. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[3]Although the Bravos' original complaint names individual officers from the SBSO, the Bravos neither opposed those individuals' motions for summary judgment below nor filed their own motion for summary judgment against them, thereby waiving any right to appeal the district court's grants of summary judgment with respect to them. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1058-59 (9th Cir. 2007); *USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994).

a genuine issue of material fact in the nonmoving party's favor, the court "may not affirm a grant of summary judgment . . . because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009) (internal quotation marks and alterations omitted).

## DISCUSSION

### I.   Claims Against the City of Santa Maria Defendants

#### A.   Invalid Search Warrant

[1] Just as the Fourth Amendment prohibits warrantless searches generally, so too does it prohibit a search conducted pursuant to an ill-begotten or otherwise invalid warrant. *See* U.S. Const. amend. IV; *Millender v. Cnty. of L.A.*, 620 F.3d 1016, 1024 (9th Cir. 2010) (en banc) ("Even when only a portion of a search warrant is invalid, the subject of the search suffers a constitutional violation."). The Bravos argue that the search warrant for their home was invalid because it was obtained through the intentional or reckless omission of facts "required to prevent technically true statements in the affidavit from being misleading." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (citing *United States v. Stanert*, 762 F.2d 775, 781, *as amended*, 769 F.2d 1410 (9th Cir. 1985)).

[2] To survive summary judgment on a claim of judicial deception, a § 1983 plaintiff need not establish specific intent to deceive the issuing court. *See Lombardi v. City of El Cajon*, 117 F.3d 1117, 1124 (9th Cir. 1997). Rather, the plaintiff must (1) establish that the warrant affidavit contained misrepresentations or omissions material to the finding of probable cause, and (2) make a "substantial showing" that the misrepresentations or omissions were made intentionally or with reckless disregard for the truth. *See Ewing v. City of Stockton*,

588 F.3d 1218, 1223-24 (9th Cir. 2009); *accord Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002); *Liston*, 120 F.3d at 973-74. If these two requirements are met, the matter must go to trial. *Liston*, 120 F.3d at 973.

The district court concluded that the omission of Javier Jr.'s custody status was not material and that in any event the Bravos presented no evidence to support an inference of intentional or reckless conduct on Tanore's part. We disagree on both counts.

### 1.   A Material Omission

We review de novo the district court's conclusion that Tanore's omission of Javier Jr.'s custody status was not material to a finding of probable cause. *See id.*; *Butler*, 281 F.3d at 1024 ("Materiality is for the court . . . ." (citing *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995))). To determine the materiality of omitted facts, we consider "whether the affidavit, once corrected and supplemented, establishes probable cause." *Ewing*, 588 F.3d at 1224; *accord Liston*, 120 F.3d at 973. If probable cause remains after amendment, then no constitutional error has occurred. *See Ewing*, 588 F.3d at 1224; *Liston*, 120 F.3d at 973-74.

**[3]** Here, the affidavit on its face easily established a "fair probability" that the evidence sought would be found, had Javier Jr. actually resided at the Bravo residence. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Tanore verified that the Bravo home was Javier Jr.'s last-known residence based on DMV records, prior search warrants, SBSO records, and the confidential informants' personal knowledge. *See Liston*, 120 F.3d at 973 (finding that the utility records, officer surveillance, and DMV records included in a warrant application ordinarily would have provided a sufficient basis for establishing probable cause). Furthermore, Tanore permissibly relied on the witnesses' confidential information regarding the Tangas' practice of storing weapons for one another, which

was consistent with his own expertise and knowledge of the gang's operations. Finally, Tanore had probable cause to believe Javier Jr. was affiliated with the Tangas based not only on the confidential informants' tips, but also on SBSO records verifying Javier Jr.'s criminal history in connection with other Tangas gang members. The district court therefore properly rejected the Bravos' alternative argument that, even absent judicial deception, the warrant lacks sufficient indicia of reliability and is facially invalid due to lack of particularity.

**[4]** Nonetheless, we must ask whether probable cause remains once the affidavit is supplemented with the challenged omission—here, Javier Jr.'s two-year sentence imposed over six months prior to the incident occasioning the search warrant, and his consequent incarceration in state prison at the time of the drive-by shooting and of the warrant's execution. We conclude that the corrected affidavit could not establish probable cause for the search and especially does not meet the heightened standard of justification required for nighttime SWAT service.[4]

**[5]** The district court reasoned that Javier Jr.'s presence was immaterial because the warrant was not for his arrest but only to search for evidence related to the April 21 shooting. This fact, however, was highly material to the search, which authorized the seizure of evidence relating to the April 21 shooting. Javier Jr.'s custody status meant not only that he would not be present in the Bravo residence at the time of the search, but that he could not have been involved in the shoot-

---

[4]In addition to faulting omission of Javier Jr.'s two-year state prison sentence, the Bravos assert error in a variety of other omissions that resulted in a failure to show: (1) when Javier Jr. actually lived at the Bravo residence; (2) that past searches for Javier Jr. at the Bravo residence had been conducted years earlier; (3) that Javier Jr. did not have a current driver's license; and (4) that SMPD records did not identify Javier Jr. as a gang member in his "Mugshot Profile." While these facts bear on the existence of probable cause, the district court did not err in concluding that none is on its own material for purposes of a judicial deception claim.

ing or in concealing the evidence. Tanore had no evidence that Mr. and Mrs. Bravo or E.B. were involved in the April 21 shooting or that during a period in which Javier Jr. was not residing in their home they would have assisted Tangas gang members in concealing evidence, and specifically in concealing evidence from the shooting. The generalized statements in the affidavit that it is "common" for families of gang members to assist other members of the gang are insufficient to support probable cause to search the Bravos' home. *See United States v. Rodgers*, 656 F.3d 1023, 1030-31 (9th Cir. 2011) (stating that "an assumption that most sixteen-year-old passengers have identification does not lead to probable cause to search every car carrying a teenager absent some individualized suspicion regarding the teenager, the vehicle in question, and the crime at issue"); *United States v. McCarty*, 648 F.3d 820, 830 (9th Cir. 2011) ("Searches and seizures are ordinarily unreasonable in the absence of individualized suspicion of wrongdoing, and the circumstances under which a warrantless search not supported by probable cause may be considered reasonable under the Fourth Amendment are very limited.") (internal quotation marks and citations omitted).

**[6]** Moreover, the warrant also authorized the search of any and all firearms, ammunition, casings, cartridges, cleaning equipment, or scabbard of any type of firearm found on the premises during the warrant's execution, and any indicia of gang membership or affiliation with any gang, including writings, photographs, news clippings, or videos depicting persons, vehicles, weapons, clothing, handsigns, or locations appearing relevant to gang membership. Defendants' only basis for seizing indicia of gang association and weapons other than the caliber handguns suspected of use in the drive-by shooting was to gather evidence of Javier Jr.'s suspected violation of California Penal Code § 186.22(a) ("Street Terrorism Enforcement and Prevention Act"). That statutory provision makes guilty of a felony any person who "actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of crimi-

nal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang," as defined in § 186.22(f). Cal. Penal Code § 186.22(a). Probable cause must support the search for and seizure of all items described in the warrant. *See Millender*, 620 F.3d at 1024. Tanore had no evidence that Mr. and Mrs. Bravo or E.B. were gang members of any kind. Probable cause to search broadly for any and all guns, ammunition, and indicia of gang affiliation therefore was predicated entirely on Javier Jr.'s *own* suspected involvement in hiding weapons for other gang members.

**[7]** Furthermore, once the affidavit was corrected and supplemented with the missing information about Javier Jr.'s custody status, even if we were to conclude that cause existed for a search, there would still be no basis for authorizing nighttime service. A nighttime incursion by a SWAT force is a far more serious occurrence than an ordinary daytime intrusion pursuant to a regular warrant and therefore requires higher justification beyond mere probable cause to search. *See United States v. Colonna*, 360 F.3d 1169, 1176 (10th Cir. 2004) ("[T]he mere likelihood that drugs or weapons will be found at a particular premises does not justify a no-knock or nighttime execution of a search warrant."). Were this not the case, then any showing of probable cause to search would justify nighttime intrusion by a team of SWAT officers. The Supreme Court has held clearly that a no-knock entry is justified only by "exigent circumstances," which include when officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

**[8]** We see no reason not to apply the same standard to SWAT officers' nighttime searches, which both constitute much greater intrusions on one's privacy than ordinary day-

time searches and carry a much higher risk of injury to persons and property. *See Alexander v. City & Cnty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994) (explaining that a jury might conclude that deployment of a SWAT team for the purpose of inspecting property was excessive); *Estate of Smith v. Marasco*, 430 F.3d 140, 149 (3d Cir. 2005) ("[A] decision to employ a SWAT-type team can constitute excessive force if it is not objectively reasonable to do so in light of the totality of the circumstances." (internal quotation marks omitted)); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001) ("[T]he decision to deploy a SWAT team to execute a warrant must be 'reasonable' because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests."); *Rush v. Mansfield*, 771 F. Supp. 2d 827, 858-59 (N.D. Ohio 2011); *Solis v. City of Columbus*, 319 F. Supp. 2d 797, 808-09 (S.D. Ohio 2004).

**[9]** Had Javier Jr.'s incarceration been disclosed and probable cause for a search still existed, no reasonable cause for nighttime service would have remained under the totality of the circumstances. Defendants argue that disclosing Javier Jr.'s two-year sentence would not be dispositive of his custody status because presentence credits and good time or work credits might have resulted in an earlier release date. But the appropriate inquiry is not whether Javier Jr.'s two-year sentence dispositively "established" he was still in custody, but rather whether that fact would have prompted the issuing judge to "requir[e] additional information" or "impos[e] specific restrictions on [the warrant's] execution." *Liston*, 120 F.3d at 974.

In *Liston*, the Court found that an officer's failure to disclose in a search warrant application the presence of "For Sale" and "Sold" signs on the target property constituted a material omission. Although the signs on their own may not have established dispositively that the house belonged to new owners, they would have "put a reasonable magistrate on

notice that a change in occupancy would be occurring in the near future." *Id.* Similarly here, disclosure of Javier Jr.'s two-year sentence would have put the issuing judge on notice that Javier Jr. could still be in custody. Had the omitted facts of Javier Jr.'s two-year sentence and custody status been included, it is extremely doubtful that an issuing judge would simply have issued the warrant or authorized nighttime service without more information. *See id.*

Finally, the defendants' reliance on *Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005) (en banc), is misplaced. *Motley* did not hold that custody status is immaterial to whether officers have probable cause to search a person's residence; indeed, probable cause to search was not at issue in that case. *Motley* held only that where a parolee has consented to warrantless searches of his residence and property at any time as a condition of his parole, law enforcement has a constitutional obligation to ensure they have probable cause to believe they are at the right house. *Id.* at 1079-80. Javier Jr. was not a parolee, and no resident of the Bravo home consented to a warrantless search. *Motley* therefore does not absolve defendants of their constitutional obligation to establish probable cause to search for all items described in the search warrant.

## 2.   Intentional or Reckless

We next consider whether the Bravos have made a substantial showing that Tanore deliberately or recklessly omitted Javier Jr.'s custody status. Viewing the evidence and drawing all inferences in the light most favorable to the Bravos, as we must, we conclude that the district court erred in finding Tanore "negligent at most."

To survive summary judgment, the Bravos need only make a substantial showing of a deliberate or reckless omission, not provide "clear proof." *Liston*, 120 F.3d at 974 (internal quotation marks omitted). Summary judgment is improper where "there is a genuine dispute as to the facts and circumstances

within an officer's knowledge or what the officer and claimant did or failed to do." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (internal quotation marks and citation omitted); *see Butler*, 281 F.3d at 1024 ("[S]tate of mind is for the jury." (citing *Hervey*, 65 F.3d at 789)).

[10] The Bravos have made the required substantial showing that Tanore may have intentionally or recklessly omitted Javier Jr.'s two-year sentence from his affidavit. Tanore stated in his deposition testimony that he reviewed Javier Jr.'s rap sheet in preparing the affidavit, and though he could not recall with certainty whether he had observed Javier Jr.'s two-year sentence, imposed on September 9, 2005, he acknowledged that he may have. The two-year sentence appears on the rap sheet a mere two lines below the "convicted" disposition for the predicate offense of receiving stolen property in violation of California Penal Code § 496(A)—a fact Tanore thought important enough to include in his affidavit.

[11] For summary judgment review purposes, the Bravos are entitled to the reasonable inference that Tanore in fact observed the two-year sentence on the rap sheet and either deliberately or recklessly failed to disclose it in his affidavit. Tanore's testimony that, even if he had observed the state prison sentence on Javier Jr.'s rap sheet, it ordinarily "wouldn't be something [he] would check into," underscores his apparent disregard for the importance of full disclosure of information to the issuing magistrate. Finally, although he claims that, in this instance, he actually did look into the warrant targets' custody status by having Detective Lara call the SBSO substation and ask the custody officer to "run the names" of the targets, the Bravos submitted evidence contradicting such claims: no custody officer who was working during the relevant time period recalls receiving a call from Lara. And SBSO custody officers declared that, even if they had received such a request, their standard database search would reveal only whether the subject was currently in county jail, not whether that person had been transferred to state prison.

Based on this record, a reasonable jury could conclude that Tanore intentionally or recklessly omitted the two-year-sentence information from the affidavit, and the Bravos presented ample evidence to support that inference. In opposing summary judgment, the Bravos submitted deposition testimony by Lieutenant Ralston, who stated "that a reasonably competent police officer, had he seen [the two-year sentence on Javier Jr.'s rap sheet], would have done additional follow-up." Ralston further testified that he told Tanore and Lara he "was disappointed that they didn't pay attention to [the two-year sentence] or didn't see it" because he thought it was "pertinent to the investigation," "was something that should have been observed," and was "important to know . . . . Important enough to tell the judge when you were seeking the warrant." Similarly, the SBSO Sheriff's Commander testified that "if the reason for the gang association warrant was because [Javier Jr.] was associated with that residence and I knew that he was not, in fact, there, that he was in prison, I'd ask a lot more questions about the warrant and the people who lived there and do some more background checks and find out why, in fact, that residence had been identified as a possible search warrant." All this and other evidence in the record suggests that Tanore's omission of this material fact was more than "mere negligence."

**[12]** Given the importance of the custody status to the finding of probable cause for the search and to the justification for nighttime service, a reasonable jury could conclude that Tanore's failure to mention Javier Jr.'s two-year sentence or to follow up and inquire about Javier Jr.'s custody status amounted to at least reckless disregard for the truth. Summary judgment was therefore improperly granted.

## B.   Unreasonable Manner of Execution

The Bravos also seek to hold the Santa Maria Defendants liable for the unreasonable manner in which the SBPD SWAT team served the warrant, arguing that the manner of execution

was a "natural consequence[ ]" of SMPD's decisions to employ nighttime SWAT service. *Lee v. Gregory*, 363 F.3d 931, 935 (9th Cir. 2004) (holding a police officer responsible for plaintiff 's unlawful arrest even though he passed the warrant on to another officer); *see also Liston*, 120 F.3d at 981 n.13 (noting that an officer's liability for the unlawful acts of those who execute a warrant he obtained by judicial deception "is governed by traditional tort law principles" (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996)). The Santa Maria Defendants vigorously contest this claim, insisting they had no control or direction over the manner in which SBPD served the warrant on the Bravo residence.

**[13]** Because the district court determined that the search warrant was valid, it had no occasion to consider this question. Rather than address it now, we remand for the district court to consider in the first instance the extent to which the Santa Maria Defendants might be liable for the warrant's unlawful manner of execution, even though service was made by a different law enforcement agency acting in concert with the SMPD. We recognize that "[t]ypically, of course, only one or a few officers plan and lead a search, but more—perhaps many more—help execute it." *Motley*, 432 F.3d at 1081 (internal quotation marks omitted). However, while the officers tasked with executing a warrant are "generally entitled to rely on information obtained from fellow law enforcement officers" so long as such reliance is objectively reasonable, *id.*, "[t]he officers who lead the team that executes a warrant are responsible for ensuring that they have lawful authority for their actions" and cannot evade liability simply by delegating responsibility to others, *id.*

**[14]** The district court did consider and reject the Bravos' claim that the SMPD officers unlawfully detained them while continuing to search their home, even after learning that Javier Jr. was in custody, concluding that the "temporary detention of the Bravos, while undoubtedly frightening and humiliating to them, was a routine detention of residents in a

house while it was being searched for contraband pursuant to a valid warrant." To the extent the district court's holding regarding the lawfulness of the search rests on the premise that SMPD officers were acting pursuant to a valid warrant, it is remanded for further consideration in light of this Opinion.

If a jury finds that Tanore intentionally or recklessly withheld information about Javier Jr.'s custody status from the issuing magistrate, the district court should apply traditional tort law principles to determine the extent to which the Santa Maria Defendants are liable for any constitutional injuries the Bravos may have suffered as a "natural consequence[ ]" of the judicial deception. *Lee*, 363 F.3d at 935 n.3; *see Malley*, 475 U.S. at 345 n.7 (rejecting an argument that "the judge's decision to issue the warrant breaks the causal chain between the application for the warrant and the improvident arrest" because "the common law recognized the causal link between the submission of a complaint and an ensuing arrest"); *Monroe v. Pape*, 365 U.S. 167, 187 (1961) ("Section [1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions."), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Crumpton v. Gates*, 947 F.2d 1418, 1423 (9th Cir. 1991) (observing that "[t]he Supreme Court has sanctioned the resort to tort analogies in establishing the elements of a section 1983 cause of action"); *Liston*, 120 F.3d at 981 n.13; Restatement (Second) of Torts § 8A cmt. b (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.").

## C.   Individual and Municipal Liability

The Bravos sued Tanore, Ralston, and Macagni in their individual capacities and the City of Santa Maria under several municipal liability theories. Because the district court did

not have occasion to reach these issues, we do not address them here. *See Golden Gate Hotel Ass'n v. City & Cnty. of San Francisco*, 18 F.3d 1482, 1487 (9th Cir. 1994) ("As a general rule, 'a federal court does not consider an issue not passed upon below.' ") (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)).

## II.  Claims Against the County of Santa Barbara Defendants[5]

### A.  Integral Participation

**[15]** The Bravos also contend that SBSO agents are liable for the unreasonable manner in which the warrant was executed by the SBPD SWAT team, arguing that the SBSO's role in initially scouting the Bravo residence amounted to "integral participation" in the unlawful search. Their argument is without merit.

Section 1983 liability extends to those who perform functions "integral" to an unlawful search, even if their individual actions do not themselves rise to the level of a constitutional violation. *See Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004); *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). However, the "integral participant" doctrine does not

---

[5]We have jurisdiction over the appeal concerning the County of Santa Barbara Defendants pursuant to 28 U.S.C. § 1291. Even though the district court failed to issue and enter on the docket a separate judgment on the order granting the County of Santa Barbara Defendants summary judgment, as was required, *see* Fed. R. Civ. P. 58(a)(1), 79(a), the district court's September 25, 2008 Order granting summary judgment "in favor of all County Defendants . . . on all claims" and containing no equivocal language regarding its finality (1) is a "full adjudication of the issues," and (2) "clearly evidences the judge's intention that it be the court's final act in the matter." *Casey v. Albertson's, Inc.*, 362 F.3d 1254, 1258 (9th Cir. 2004); *accord Long v. Cnty. of L.A.*, 442 F.3d 1178, 1184 n.3 (9th Cir. 2006). "[N]either the Supreme Court nor this court views satisfaction of Rule 58 as a prerequisite to appeal." *Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1140 (9th Cir. 2003).

implicate government agents who are "mere bystanders" to an unconstitutional search. *Compare Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (identifying as an integral participant an officer who helped in handcuffing the plaintiff); *Boyd*, 374 F.3d at 780 (same for officers who were "aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed"); *James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (same for officers who provided armed backup during unconstitutional search); *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) (same for officer who did not enter apartment but stood armed at the door during the search); *with Torres v. City of Los Angeles*, 548 F.3d 1197, 1206 (9th Cir. 2008) (finding that an officer who neither instructed others to make the arrest nor was present during the arrest was not an integral participant); *Blankenhorn*, 485 F.3d at 481 n.12 (same for an officer who arrived at the scene after completion of allegedly unlawful arrest and an officer who provided at most crowd control); *Motley*, 432 F.3d at 1082 (same for an officer who remained primarily in the living room during an allegedly unlawful bedroom search).

The district court correctly determined that SBSO agents were "not even bystanders" to the search of the Bravo residence. The undisputed evidence establishes that no SBSO agents were present during either the SBPD SWAT team's entry into the Bravos' residence or the SMPD officers' subsequent search of the property. To the contrary, the undisputed evidence establishes SBSO's own Special Enforcement Team was at the exact same time executing the warrant for a different Tanglewood residence. It is further undisputed that SBSO neither had tactical command over service of the warrant on the Bravo residence nor supervised the SBPD SWAT agents in their execution of the warrant.

SBSO's short-lived role with respect to the Bravo residence was limited to conducting a background investigation on

Javier Jr. before handing responsibility for execution of the warrant over to SBPD. " 'Effective and efficient law enforcement requires cooperation and division of labor to function," and SBSO was "entitled to rely on information obtained from [SMPD]" when it received the request to assist with nighttime SWAT service of the Bravo residence warrant. *Motley*, 432 F.3d at 1081 (citing *Whiteley v. Warden*, 401 U.S. 560, 568 (1971)). SBSO was responsible neither for the decisions to use SWAT forces and nighttime service nor for the specific tactical decision to perform a no-knock entry, and thus it cannot be liable for the constitutional violations that may have occurred in the course of the warrant's execution.[6]

### B.   *Monell* Liability

[16]  The Bravos accuse the SBSO and the County of Santa Barbara of maintaining a policy that permitted the unreasonable use of SWAT tactics in violation of their Fourth Amendment rights. However, because the Bravos fail to establish a triable issue of fact as to any individual SBSO officer's liability under § 1983 for unconstitutional conduct, *a fortiori*, they cannot establish that a policy or practice of the SBSO caused any such constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1021 (9th Cir. 2010).

### CONCLUSION

For the foregoing reasons, the summary judgment grant is reversed with respect to Tanore and the case remanded for further proceedings consistent with this Opinion, including determining whether the Santa Maria Defendants may be lia-

---

[6]While the Bravos attempt to restyle their "integral participation" claim in their Reply Brief as one of supervisorial liability or proximate cause, akin to the one they make against the City of Santa Maria Defendants, they failed to make this argument below and it is deemed waived.

ble for the warrant's unlawful execution. In all other respects, the judgment of the district court is affirmed.[7]

**AFFIRMED in part, REVERSED in part, and REMANDED.** Each party to bear its own costs on appeal.

---

[7]All pending motions are denied.