**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAVIER BRAVO, SR.; HOPE BRAVO; E. B., a minor by her Guardian ad Litem Sara Gonzales, *Plaintiffs-Appellees/ Cross-Appellants*, v. CITY OF SANTA MARIA; LOUIS TANORE, Santa Maria Police Detective; LARRY RALSTON, Santa Maria Police Lieutenant, *Defendants-Appellants/ Cross-Appellees*. | Nos. 14-55557 14-55687 D.C. No. 2:06-cv-06851- FMO-SH OPINION |

Appeal from the United States District Court
for the Central District of California
Fernando M. Olguin, District Judge, Presiding

Argued and Submitted
October 28, 2015—Pasadena, California

Filed January 12, 2016

Before: Stephen Reinhardt, Michael Daly Hawkins, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Hawkins
Concurrence by Judge Reinhardt

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's attorneys' fee award under 42 U.S.C. § 1988 in favor of plaintiffs and reversed the costs award against defendant, the City of Santa Maria, and remanded for a new costs determination.

This appeal arises from a jury verdict that defendants, the City of Santa Maria and individual police officers, violated plaintiffs' constitutional rights when they failed to disclose certain information in a warrant to search plaintiffs' home. Prior to trial, plaintiffs settled with the City of Santa Barbara, whose officers actually carried out the entry of plaintiffs' home. The case went to trial against the Santa Maria defendants and resulted in a jury award of approximately $5,000 in damages.

The panel held that in considering an award of attorneys' fees under § 1988, it is appropriate to take into consideration a plaintiff's success in obtaining a settlement against another party arising out of the same facts. The panel held that under the facts and circumstances of this case, it was appropriate to take the Santa Barbara settlement into consideration when considering the attorneys' fee award against the Santa Maria defendants. Affirming the attorneys' fee award of $1,023,610.41, the panel held that the district court's finding that plaintiffs had achieved an excellent result was supported by the public benefit generated by the litigation as well as the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

$150,000 in damages the plaintiffs obtained in the Santa Barbara settlement.

The panel reversed the district court's refusal to offset the award of costs assessed against the Santa Maria defendants by the costs already reimbursed by the City of Santa Barbara as part of the settlement. The panel remanded for consideration of what amount of the costs award, if any, should be offset by the costs already paid by the City of Santa Barbara defendants.

Judge Reinhardt concurred in the majority opinion, but wrote separately to explain why he would uphold the attorneys' fee award in this case irrespective of whether or not the settlement with the Santa Barbara defendants was taken into consideration. Judge Reinhardt would uphold the fee award even if the only monetary benefit to plaintiffs was the $5,000 verdict.

---

### COUNSEL

Jeffrey E. Raskin (argued) and Timothy T. Coates, Greines, Martin, Stein & Richland LLP, Los Angeles, California; David M. Cumberland, Joshua M. George, and Jordan Cunningham, Adamski Moroski Madden Cumberland & Green LLP, San Luis Obispo, California, for Defendants-Appellants/Cross-Appellees.

Donald W. Cook (argued) and Robert Mann, Los Angeles, California, for Plaintiffs-Appellees/Cross-Appellants.

---

## OPINION

HAWKINS, Circuit Judge:

This appeal arises from a jury verdict that Defendants the City of Santa Maria ("City") and Louis Tanore, Larry Ralston, and Danny Macagni of the Santa Maria Police Department ("SMPD") violated the constitutional rights of Plaintiffs Javier Bravo, Sr., his wife Hope, and their granddaughter E.B. (collectively, "the Bravos"). Specifically, the jury found that SMPD officers failed to disclose in seeking a warrant to search the Bravos' home that Javier Bravo, Jr.—suspected of hiding weapons that may have been used in a gang-related shooting incident—was not living and had not been living in the home for some seven months prior to the shooting because he was incarcerated in state prison on unrelated charges. The resulting pre-dawn, SWAT-style search of the Bravos' residence did not yield any weapons, but succeeded in rousing the Bravos from their beds and frightening them. Prior to trial, the Bravos settled with the City of Santa Barbara, whose officers actually carried out the entry of the Bravo home, for $360,000. The case went to trial against the remaining defendants and resulted in a jury award of $5,000 in compensatory damages to Javier Sr. and nominal damages to Hope and E.B. In this opinion,[1] we address an issue of first impression: whether in considering an award of attorney fees under 42 U.S.C. § 1988, it is appropriate to take into consideration a plaintiff's success in obtaining a settlement against another party arising out of the same facts. For the reasons set forth below, we conclude that, under the facts and circumstances of this case, it was appropriate to take

---

[1] In a separate Memorandum filed contemporaneously, we address other issues presented in this appeal.

the Santa Barbara settlement into consideration and, accordingly, we affirm the district court's fee award. On the same theory, we vacate the cost award against the Santa Maria defendants and remand for the district court to take into account the costs recovered in the Santa Barbara settlement and offset those costs against the costs to be awarded against the Santa Maria defendants.

## BACKGROUND

### I.  Facts

#### A.  Shooting Incident and Investigation

While investigating an April 2006 gang-related shooting, SMPD detectives Louis Tanore and Eligio Lara learned that Javier Bravo, Jr. and about a dozen others might have been involved in the shooting or might possess evidence of the crime (in particular, the weapons used).

Tanore directed Lara to gather information on eight of these individuals, including checking into their criminal histories and custody status. According to Lara's testimony, he called the Santa Barbara county jail to determine the custody status of the eight targets. Lara learned from these calls that one of the eight—James Franklin—had been transferred from county custody to state prison. He disclosed this finding to Tanore, and Franklin was removed from the list of targets. According to a county jail official's trial testimony, Lara asked whether Javier Jr. was in county custody (he was not), but he did not ask follow-up questions about whether, like Franklin, Javier Jr. had been transferred from county to state custody. Lara never learned this.

## B.  Custody Check Procedure

To determine a target's custody status, SMPD officers' practice was to call the Santa Barbara county jail.  County jail officials can determine whether a target is in county custody, as well as whether he has been released or transferred to state custody.  Determining whether a target is in county custody and determining whether he has been transferred to state custody requires two different computer searches.

Lara and Larry Ralston, the lead supervisor of the investigation, testified that if an SMPD officer learned that a target had been transferred to state custody, he or she would then follow up with state authorities.  Tanore testified that SMPD practice was to call the Santa Barbara county substation regardless of whether a person was potentially in county or state custody; he did not mention any follow-up procedure.

## C.  Warrant Affidavit

Based in part on information gathered by Lara, Tanore prepared an affidavit in support of nighttime warrants to search the homes of Javier Jr. and six other suspected gang members.  The affidavit included criminal history information on each target, including Javier Jr., which Tanore obtained by reviewing rap sheets provided by Lara.  The affidavit stated that Javier Jr. had been arrested or charged numerous times in the past and included possession of known stolen property as one of the crimes for which he had been arrested or charged.  However, the affidavit did not include the dates of the offenses.  Nor did it disclose that Javier Jr. had been sentenced to two years in state prison in September 2005—about seven months prior to the shooting

incident—for the stolen property offense, or that he might still be incarcerated.

### D. Search

The magistrate judge approved a warrant for a nighttime search.  Because SMPD lacked the resources to conduct seven simultaneous home searches, its officers invited the Santa Barbara Sheriff's Office (a county agency) and Santa Barbara Police Department (a city agency) to conduct some of the searches.  Tanore informed the partner agencies of the risks and dangers of the search.  Though neither Tanore nor anyone else from SMPD prescribed the partner agencies' tactics, Tanore stated that he was not surprised that they elected to use a SWAT team.

At 5:26 a.m. on April 26, 2006, a Santa Barbara Police Department SWAT team knocked on the front door of the Bravos' residence, announced their presence, and three seconds later shot off the locks and broke down the door. Simultaneously, the team deployed two "flashbang" grenades outside of the back door.

Javier Sr., Hope, and E.B. (eight years old at the time) were awakened by these loud noises and frightened to see armed individuals in their home.  Javier Sr. initially believed that robbers were invading the house or that his son had escaped from jail and been shot at his doorstep, causing him to experience heart-attack-like symptoms.  All three plaintiffs testified that they were not touched during the search.  Hope and E.B. were told to lie on the floor in the bathroom, where they had gone to hide upon hearing the loud noises.  After securing the residence, the City of Santa Barbara officers turned the scene over to SMPD to search the house.

At some point during the search, Hope informed the officers that Javier Jr. was in prison and showed them a letter she had recently received from him. As Tanore was off-site, an officer at the scene called to inform him that Javier Jr. was in custody, at which time Tanore instructed the officer to continue with a "cursory" search of the residence. SMPD seized a number of items from the home, but found no weapons.

## II. Procedural History

### A.  Complaint, Pretrial Motions, and Prior Appeal

In October 2006, the Bravos brought suit against Tanore, his supervisor Ralston, SMPD Chief of Police Danny Macagni, and the City of Santa Maria, as well as the counties of San Luis Obispo and Santa Barbara, their sheriff's offices and county sheriffs, and the cities of San Luis Obispo and Santa Barbara and their police chiefs. The Bravos alleged violations of the Fourth and Fourteenth Amendments (due process and equal protection) and various state laws, and requested unspecified amounts of general, special, and punitive damages, a $25,000 civil penalty, and recovery of related costs.

Plaintiffs stipulated to dismiss their claims against the County of San Luis Obispo and City of San Luis Obispo defendants early in the case. They settled with the City of Santa Barbara defendants for $360,000 after the City of Santa Barbara defendants appealed the district court's denial of qualified immunity. The settlement amount consisted of $50,000 in damages for each plaintiff, $169,856.34 in attorney fees, and $16,208.95 in costs.

The district court then granted summary judgment for the County of Santa Barbara and the Santa Maria defendants. The Bravos appealed.  In that appeal, we affirmed the grant of summary judgment for the County of Santa Barbara defendants, but reversed the grant of summary judgment in favor of the Santa Maria defendants. *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1091 (9th Cir. 2011).  We rejected the district court's finding that the omission of Javier Jr.'s custody status was immaterial, concluding that if "Javier Jr.'s two-year sentence imposed over six months prior to the incident occasioning the search warrant" and his incarceration at the time of the shooting were included, the affidavit "could not establish probable cause for the search and especially does not meet the heightened standard of justification required for nighttime SWAT service." *Id.* at 1084.  Javier Jr.'s custody status "meant not only that he would not be present in the Bravo residence at the time of the search, but that he could not have been involved in the shooting or in concealing the evidence." *Id.*

We also rejected the conclusion that Tanore was "negligent at most" in omitting Javier Jr.'s custody status, concluding that the Bravos  "presented sufficient evidence establishing a genuine issue as to whether [Tanore's] omission of [Javier Jr.'s sentence and custody information from the affidavit] was intentional or reckless, as opposed to merely negligent . . . ." *Id.* at 1080.

## B.  Jury Verdict and Post-Trial Judgment

On remand,    after five days of hearing evidence and four days of deliberation, the jury returned a special verdict finding all Santa Maria defendants liable.  The jury awarded $5,000 in compensatory damages to Javier Sr. and $0 to Hope

and E.B.  It did not award punitive damages.  The district court entered judgment, awarding $5,000 to Javier Sr. and $1 each to Hope and E.B.

After judgment was entered, Defendants renewed their motion for judgment as a matter of law, attacking the findings of liability against Tanore, Ralston, Macagni, and the City. Defendants also moved to amend the judgment, contending that damages, attorney fees, and costs should be offset by the Bravos' $360,000 settlement with the City of Santa Barbara. The Bravos moved for a new trial on damages, and requested an award of attorney fees and costs.

The district court granted the Defendants' motion for judgment as a matter of law as to Police Chief Macagni's individual liability, but denied the motion as to Tanore, Ralston, and the City.  Regarding Defendants' motion to amend the judgment, the court concluded that any award of attorney fees should be offset by the attorney fees portion of the City of Santa Barbara's settlement ($169,856.34) but that any award of costs should not be offset by the costs already paid in the City of Santa Barbara settlement ($16,208.95). Finally, the court denied the Bravos' motion for a new trial on damages, but named the Bravos the prevailing parties and awarded $1,023,610.41 in attorney fees and $13,376.85 in costs.  The court then entered an amended judgment, which the parties timely cross-appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291.  Attorney fee and costs awards are reviewed for abuse of discretion. *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002,

1010 (9th Cir. 1998); *Corder v. Brown*, 25 F.3d 833, 836 (9th Cir. 1994).

## ANALYSIS

In a contemporaneously filed Memorandum, we affirm the district court's decisions to grant judgment as a matter of law to Defendant Macagni, to deny judgment as a matter of law to Defendants Tanore, Ralston, and the City, and to deny Plaintiffs' motion for a new trial on damages. We address in this opinion only the district court's decisions as to attorney fees and costs.

## I.  Attorney Fees

In a 42 U.S.C. § 1983 suit, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). To determine the amount of a reasonable fee, district courts typically proceed in two steps: first, courts generally apply the lodestar method to determine what constitutes a reasonable attorney fee; and second, the district court may then adjust the lodestar upward or downward based on a variety of factors, including the degree of success obtained by the plaintiffs. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). The Supreme Court teaches that the degree of success obtained is "'the most critical factor' in determining the reasonableness of a fee award." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)). "It is an abuse of discretion for the district court to award attorneys' fees without considering the relationship between the 'extent of success' and the amount of the fee award." *McGinnis v. Ky. Fried Chicken*, 51 F.3d 805, 810 (9th Cir. 1994) (quoting *Farrar*, 506 U.S. at 116).

Here, it is undisputed that the Bravos are prevailing parties,[2] and Defendants do not contest the district court's lodestar calculation. The sole issue before us is whether the district court erred in its analysis of the degree of Plaintiffs' success. Defendants contend that the district court dramatically overvalued the degree of success. Since the Bravos won only $5,002 at trial, the question is whether this litigation generated some other benefit that would justify the district court's finding that the Bravos achieved an excellent result and the consequent award of $1.023 million in attorney fees.

We identify two such benefits in the record. First, the district court properly noted that this litigation benefitted the public by identifying a serious flaw in SMPD's method of checking individuals' custody status before seeking warrants. In addition, this litigation led to our earlier *Bravo* decision, in which we held that greater justification is needed for a nighttime forced entry by a SWAT unit than for an ordinary search. 665 F.3d at 1085-86. This provides guidance to law enforcement officers and to magistrate judges considering the issuance of such warrants. *See Gonzalez*, 729 F.3d at 1210 (attorney fee award higher than the amount of damages won by plaintiff may be reasonable if the civil rights case "'also confer[red] benefits on others throughout society' by, for example, ending institutional civil rights abuses or clarifying standards of constitutional conduct" (quoting *McGinnis*, 51 F.3d at 810)).

---

[2] A plaintiff who receives nominal damages is a prevailing party for § 1988(b) purposes. *Benton v. Or. Student Assistance Comm'n*, 421 F.3d 901, 904 (9th Cir. 2005) (citing *Farrar*, 506 U.S. at 112).

Second, the district court properly considered the Bravos' $360,000 settlement with the City of Santa Barbara defendants, with $50,000 in damages for each plaintiff, as part of their success. Although we have previously held that, in certain situations, a non-settling defendant may be entitled to an offset of attorney fees paid by a settling defendant, *Corder*, 25 F.3d at 840, we have yet to articulate a rule regarding whether a district court may consider a co-defendant's settlement payment in evaluating the reasonableness of an attorney fee award. We hold now that the district court may, within the exercise of its discretion, consider the damages portion of a settlement payment by other defendants in evaluating a plaintiff's degree of success. However, it should do so only if and to the extent that plaintiff's counsel's time spent on settling defendants cannot be fairly separated from the time spent on non-settling defendants. Factors to consider include whether the plaintiff's claims against both sets of defendants "involve a common core of facts" or are "based on related legal theories," *cf. Hensley*, 461 U.S. at 435; if the claims are in fact divisible, whether that was apparent from the outset or whether the divisible nature became clear as the litigation developed and discovery progressed; and whether the claims against the settling defendants were, in the district court's considered judgment, meritorious, or whether they were settled for nuisance value.[3]

---

[3] This determination is not unlike the determination whether defendants are jointly and severally liable for the plaintiff's injury. *Cf. Hazle*, 727 F.3d at 995; *see also The Atlas*, 93 U.S. (3 Otto) 302, 306 (1876) ("The common law creates a joint and several liability . . . because by a single and forcible act, which would not have happened except by the concurring negligence of the two parties, an injury has been done to an innocent party.").

Turning to the facts of this case, the district court appropriately found that the Bravos' claims against the Santa Maria and the City of Santa Barbara defendants are factually and legally intertwined. Plaintiffs' theory of liability was that the Santa Maria defendants caused Santa Barbara to use a SWAT team to force entry into the Bravos' home. Given that the district court decided as a matter of law that the no-knock entry violated the Fourth Amendment, it is clear that the claims against the City of Santa Barbara defendants were meritorious and not settled merely for nuisance value.

Accordingly, we affirm the attorney fee award.

## II. Offsets of Costs

Defendants contend that the district court abused its discretion when it refused to offset its award of $13,376.85 in costs, by the $16,208.95 in costs paid by the City of Santa Barbara defendants. In refusing to offset costs, the district court held that costs are not akin to attorney fees, for which offsets are required, but rather "are more analogous to damages . . . , and therefore require defendants to pay at least their proportional share."

Whether an award of costs must be offset by costs paid by a settling co-defendant also appears to be an issue of first impression in this circuit. There is little case law directly on point.[4] Therefore, we reason from principle and analogy and

---

[4] *See Gutierrez v. Vantia Properties, LLC*, No. 1:13-CV-00642-LJO, 2014 WL 2106570, at *11 (E.D. Cal. May 20, 2014) (recommending that damages, attorney fees, and costs be offset by the amount paid by settling co-defendant); *In re Vitamin C Antitrust Litig.*, 2013 WL 6858853, at *6 (E.D.N.Y. Dec. 30, 2013) (denying plaintiffs' request for costs already

hold that the Santa Maria defendants are entitled to an offset of costs to the extent that the litigation expenses have already been reimbursed.

Contrary to the district court's holding, costs are not analogous to damages. They are not compensation for loss and, unlike the determination of damages, which is usually left for the jury, the calculation of costs is almost exclusively a function for a judge, *see* 10 Wright & Miller, Federal Practice and Procedure § 2665 (3d ed. 1998). Costs are more analogous to attorney fees. Like attorney fees, costs are a reimbursement for "litigation-related expenses that a prevailing party is entitled to be awarded." *Taxation of Costs*, Black's Law Dictionary (10th ed. 2014); *cf.* Fed. R. Civ. P. 54(d) (referring to "costs – other than attorney's fees"); 10 Wright & Miller, Federal Practice and Procedure § 2675 (3d ed. 1998) (treating attorney fees as component of costs).

We held in *Corder* that a district court abuses its discretion when it refuses to offset an award of attorney fees by a settling defendant's payment of those same fees. We reasoned that 42 U.S.C. § 1988 allows "reasonable" fees and that a second payment for the same billable time is an unreasonable double recovery. 25 F.3d at 840. As Defendants contend, attorney fees are a component of costs under 42 U.S.C. § 1988. *Marek v. Chesny*, 473 U.S. 1, 9 (1985); *Fulps v. City of Springfield*, 715 F.2d 1088, 1092–93 (6th Cir. 1983). Thus, double recovery of costs other than attorney fees is just as impermissible as double recovery of attorney fees.

---

paid by settling co-defendants, absent evidence from plaintiffs that the requested costs were different expenses).

The district court's reasoning that the deterrent principle at the heart of § 1983 allows double recovery of costs is unpersuasive.  While the statute is designed to deter civil rights violations and encourage access to the courts to redress often economically unviable injuries to fundamental rights, *see generally City of Riverside v. Rivera*, 477 U.S. 561, 574–77 (1986), that basic principle does not require double reimbursement of identical litigation expenses.  The statute does not specifically address this scenario, but it is difficult to imagine Congress intended for litigation expenses to be paid multiple times.  Nor would eliminating duplicative payments for litigation expenses significantly influence counsel's decision to prosecute civil rights suits.  Costs are nearly always a smaller prize than fees (which also cannot be double-counted), and "almost always amount to less than the successful litigant's total expenses in connection with a lawsuit."  10 Wright & Miller, Federal Practice and Procedure § 2666.  The decision to pursue a claim does not likely hinge on the prospect of recovering out-of-pocket expenses multiple times for the same litigation activities.

The principle of not allowing double recovery of costs under § 1988 is also supported by analogous California law. Under California law, when a pretrial settlement with one defendant covers the very same costs a plaintiff is trying to recover from the non-settling defendant, the plaintiff cannot recover the same costs twice.  *See Regan Roofing Co. v. Superior Court*, 27 Cal. Rptr. 2d 62, 76 (Ct. App. 1994).  A California statute similarly provides that costs must be reasonable.  Cal. Civ. Proc. Code § 1033.5(c)(2), (3); *see also* 7 Witkin, California Procedure § 118 at 657 (5th ed. 2008).

Thus, whether this question is analyzed pursuant to federal common law or California law,[5] the district court erred by applying the incorrect legal standard. Accordingly, we remand for the district court to determine what amount of costs should be offset.

## CONCLUSION

We affirm the attorney fees award because the district court's finding that the Bravos achieved an excellent result is supported by the public benefit generated by the litigation as well as the $150,000 in damages the Bravos obtained in the Santa Barbara settlement. We reverse the district court's refusal to offset costs and remand for consideration of what amount of the costs award, if any, should be offset by the costs already paid by the City of Santa Barbara defendants.

**AFFIRMED in part, REVERSED in part, and REMANDED for determination of costs. Each party shall bear its own costs on appeal.**

---

[5] *See Corder*, 25 F.3d at 839-40 (noting courts' disagreement over whether the offset of attorney fees under § 1988 is determined by federal common law or state law, and ultimately holding as a matter of law that an offset is required under § 1988); *C.B. v. City of Sonora*, 769 F.3d 1005, 1031 & n.25 (9th Cir. 2014) (noting that it is unclear whether federal or state law should apply, but addressing offset of damages in a § 1983 suit under state law).

REINHARDT, Circuit Judge, concurring:

I fully concur in the majority opinion. I write separately, however, to explain why I would uphold the award in this case whether or not we considered the $360,000 settlement with the Santa Barbara defendants. In short, I would uphold the fee award even if the only monetary benefit to plaintiffs was the $5,000 verdict. I would do so for two reasons: (1) although the verdict was low in comparison to the fees sought by the attorneys, this litigation achieved significant non-monetary benefits for society, and (2) the entire context of the case, including the fact that plaintiffs had to overcome a robust defense, shows that the amount of time expended was necessary to vindicate the plaintiffs' rights, even if the only benefit that had accrued had been the $5,000 in damages awarded by the jury. Plaintiffs' counsel should be fully compensated for this effort. The defendants, relying in part on *Farrar v. Hobby*, suggest that we should ignore all other considerations, and that the fee award should be reduced *solely* based on a comparison between the verdict and the fee award. That position, however, is unsupported by *Farrar*, our case law, and the motivating principles of 42 U.S.C. § 1988. Accordingly, I agree with the majority that the district court did not abuse its discretion by awarding $1.2 million in attorney's fees—a 10% reduction from the cost of the time and work counsel expended on this case.

As an initial matter, there is a strong presumption that the lodestar—the amount of hours reasonably expended on the litigation multiplied by a reasonable hourly rate—is a reasonable fee to be awarded under 42 U.S.C. § 1988. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010); *Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 478 U.S. 546, 564–65 (1986); *Blum v. Stenson*, 465 U.S.

886, 897 (1984). This presumption is based on the premise that a fee under § 1988 must be "sufficient to induce a capable attorney to undertake the representation" in order to advance the private enforcement of federal civil rights laws. *Perdue*, 559 U.S. at 552; *see also* S. REP. NO. 94-1011, at 6 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5908, 5913. Once the lodestar is calculated, the district court can look to "other considerations" to determine whether this presumptively reasonable fee should be adjusted either upward or downward. *Delaware Valley*, 478 U.S. at 565.

In *Farrar v. Hobby*, a particularly unsympathetic case, the Supreme Court created a limited exception to the normal calculation of fees. 506 U.S. 103 (1992). In that case, the State of Texas temporarily closed down a school for delinquent, disabled, and disturbed teens after a student of the center died. The owner of the center, Joseph Farrar, was indicted for murder because of his failure to administer proper medical treatment. *Id.* at 105–06. Farrar subsequently sued the Lieutenant Governor of Texas, William Hobby, as well as several other state employees who had participated in the events leading to the closing of the school. *Id.* at 105. He sought $17 million in damages, alleging that he had been deprived of liberty and property without due process by means of malicious prosecution. *Id.* The jury determined that Farrar had been deprived of a civil right, but it awarded zero damages. Despite the wholly technical nature of Farrar's victory, and the fact that his law suit achieved no significant public purpose, his counsel sought $280,000 in fees. The Supreme Court forcefully denied this fee award, and held that when a plaintiff, like Farrar, achieves only technical or de minimis success, a district court "*may* lawfully award low fees or no fees" without calculating the lodestar or considering the other factors, *id.* at 114–15 (emphasis added),

because the degree of the plaintiff's overall success is the "'most critical factor' in determining the reasonableness of a fee award." 506 U.S. at 114.

In casting the critical fifth vote in *Farrar*, Justice O'Connor explained in her separate opinion that not every nominal damage award is a purely technical or de minimis victory and that, when considering the degree of overall success, a court should consider more than the monetary amount awarded by a jury. *See id.* at 120–21. In particular, she wrote, courts should consider whether the plaintiff vindicated important rights or prevailed on significant legal issues "even though no actual damages are proved." *Id.* at 121. Since Farrar had done neither of these things, Justice O'Connor agreed that his victory was solely a technical one, and that in his case a denial of attorney's fees was more than appropriate. It is important, however, that Justice O'Connor did not suggest that where actual damages are recovered that are not de minimis it is necessary for the plaintiff to establish in addition that he secured some overall societal benefit as well.

Our court has interpreted *Farrar* as having two central holdings. First, a district court *may* award little or no fees to a plaintiff who has achieved solely a *de minimis* victory, but that it should not do so if the plaintiff's lawsuit achieved significant non-monetary results for himself or other members of society. *See McCown v. City of Fontana*, 550 F.3d 918 (9th Cir. 2008) *as amended* 565 F.3d 1097, 1105; *Morales v. City of San Rafael*, 96 F.3d 359, 362–63 (9th Cir. 1996). Second, a district court abuses its discretion when it fails to consider the degree of success achieved by the plaintiff when determining a reasonable fee award. *See Morales*, 96 F.3d at 362. Nothing in these cases suggests that

the extent of victory is measured solely by the amount of the award. Indeed, a small award may represent a complete victory.[1]

I fully agree with the majority that unlike *Farrar*, this is not a case in which the district court could have awarded low or no fees without calculating the lodestar or considering the other factors. Wholly aside from the monetary considerations, this litigation resulted in significant public benefits. Our first opinion in this case clarified what probable cause is necessary to justify a warrant for a nighttime SWAT raid, a constitutional question of first impression in this Circuit. Furthermore, the litigation resulted in a verdict against the City of Santa Maria, exposing an unconstitutional practice by that City's police department. *See Wilcox v. City of Reno*, 42 F.3d 550, 556 (9th Cir. 1994) ("Exposing an unconstitutional policy [by the police department] does a great deal more than finding a plaintiff's rights have been infringed upon in some unspecified way. The police department itself, and the community at large benefit from a finding of this sort.") (affirmatively quoting the district

---

[1] Occasionally, this court has questioned the validity of awarding attorneys' fees substantially in excess of the amount recovered, but the prevailing view appears to be that which is explicated in the text *infra*. In *McGinnis v. Kentucky Fried Chicken of California*, for example, the panel applied federal law to a request for fees under a Washington state statute. 51 F.3d 805, 810 (9th Cir. 1994). There, due to a change in controlling law, the plaintiff's damages dropped from $234,000 to $34,000, but the district court declined to consider this change when determining an appropriate fee award. *Id.* In the circumstances of that case, the court determined, a reduction in fees should have been considered. *Id.* As we recently explained, however, a decision to lower attorney's fees from the lodestar should be based "in light of the context of the case" as a whole, *not based* "solely on the number of dollars" that the plaintiffs recovered. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1210 (9th Cir. 2013).

court's holding). Together, these achievements offer clear and important guidance to magistrate judges, to the City, and to other municipalities, which should reduce the likelihood that innocent individuals will be unnecessarily subjected to intrusive searches of their homes.

Since the *Farrar* exception does not apply, we must presume that the lodestar is reasonable unless other considerations suggest otherwise. *See, e.g.*, *Perdue*, 559 U.S. at 552. Here, the other considerations do not. The context of this case strongly suggests that the amount awarded by the district judge was a reasonable one, regardless of the disparity in the amount of attorneys fees required to obtain a comparatively small damage award. In particular, it is important that this case required an inordinate amount of time and labor in order to overcome an especially robust defense. Accordingly, a high award of attorneys' fees is reasonable.

Here, the plaintiffs spent 2321.32 hours pursuing claims against the Santa Maria defendants between 2006 and 2013, and there is no reason to believe that their counsel billed more than that which was necessary to win. First, all of the plaintiffs' attorneys spent less than an average of 70 hours per year on this matter. This number seems appropriate—if not low—given the complicated nature of this suit, the important interests at stake, and that it is a "highly atypical civil rights case where the plaintiff's lawyer engages in churning," *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). Indeed, at least until the prior appeal, the defense counsel spent more hours on this case than plaintiffs' counsel, which suggests that defense counsel believed this case was sufficiently complex and important to justify large amounts of attorney time. *See Burgess v. Premier Corp.*, 727 F.2d 826, 840 (9th Cir. 1984); *see also Robinson v. City of*

*Edmond*, 160 F.3d 1275, 1284 (10th Cir. 1998) ("[T]he effort expended by the defendants suggests at least that they viewed the case as sufficiently complex and serious[.]"); *Pressley v. Haeger*, 977 F.2d 295 (7th Cir. 1992) ("Three lawyers toiled a total of 1272 hours on Pressley's behalf. If this seems excessive in light of the stakes . . . it was not excessive in relation to the need to overcome a defense that Haeger and the Village waged with 2041 hours of lawyers' time.").[2] Further, plaintiffs, who bore the burden of proof, had to expend hours to overcome the opposition by the defense, which had persuaded the district court to improperly grant summary judgment, necessitating a prior appeal. *See Burgess*, 727 F.2d at 840; *Robinson*, 160 F.3d at 1275 ("[O]ne of the factors useful in evaluating the reasonableness of the number of attorney hours in a fee request is 'the responses necessitated by the maneuvering of the other side."). In short, plaintiffs' attorneys were able to achieve not only the great public benefits that they did, but the amount of damages to which the plaintiffs were entitled, only because of the consistent hours that they put in to overcoming the City's strong opposition. *See Moreno*, 534 F.3d at 1112 ("By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker."). Plaintiffs' attorneys should be fully compensated for this necessary effort.

The defendants ignore these considerations, and instead suggest that the fee award must be reduced because it is disproportionately large compared to the jury's verdict. We

---

[2] The record indicates that defendants spent more hours than plaintiffs on this case prior to the first appeal, but there is no information in the record about how many hours defendants spent on it after the first appeal.

have previously rejected similar arguments, and held that a reasonable fee must be determined "in light of the context of th[e] case," "*not* based on [the court's] own notion of the correct ratio between the amount of attorney's fees and the amount the litigants recovered." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1209 (9th Cir. 2013) (emphasis added).[3] To hold otherwise would unreasonably extend *Farrar* well beyond its core holding, and in doing so, destroy the motivating principles of § 1988.

The fundamental purpose of § 1988 is to ensure that victims of civil rights violations are able to obtain competent legal counsel who will make it possible for them to enforce their rights, including the compensation to which they are entitled on account of the violation of those rights. As the cost of litigation increases, it becomes more difficult for civil rights victims to afford competent counsel. Contingency agreements provide some redress, but not in cases in which the injury that the plaintiff suffered is comparatively small— even serious violations of civil rights do not necessarily involve serious physical injuries, and it may well be that the violation of a civil right justifies compensation in only a moderate amount. In such instances, finding a competent

---

[3] Although *Farrar* holds that the degree of success is the most important consideration, it does *not* hold that district courts *must* or even *should* ignore other considerations when determining a reasonable fee. Indeed, *Farrar* repeatedly used permissive language to convey this point. *See Farrar*, 506 U.S. at 114 ("If 'a plaintiff has achieve only partial or limited success, the [lodestar] *may* be an excessive amount.'") (emphasis added); *Id.* at 115 ("[T]he court *may* lawfully award low fees or no fees without reciting the 12 factors bearing on reasonableness[.]") (emphasis added); *Id.* ("When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is *usually* no fee at all.") (emphasis added).

lawyer to effectively handle victims' claims would be close to impossible without the incentives provided by § 1988.

Similarly, if we were to adopt a rule that limited attorney's fees in civil rights cases to an amount that is commensurate with the damages received, it would cripple the ability of victims suffering low or moderate economic damages to find competent counsel to pursue claims involving the violation of their rights. First, jury verdicts regarding damages resulting from violations of civil rights are not easily predictable. They may well depend on the predilections of the average jury in the geographic location of the occurrence or even on the happenstance of the composition of a particular jury. Such verdicts, though perfectly appropriate under the law, surely do not reflect the amount of time and effort that must necessarily be spent to win a civil rights case. Second, the astronomical costs of litigation can easily exceed moderate economic damages by a substantial multiplier. This is especially true in civil rights cases, in which municipalities often have significant non-monetary reasons to staunchly defend against such actions using the services of municipally-paid, salaried lawyers. Here, for example, the actual cost of plaintiffs' counsels' time was, without doubt, well over a million dollars. Perhaps the jury could have returned a verdict of $10,000 instead of $5,000; or perhaps $25,000, or even $100,000. Compared to the cost of litigation, any of these amounts would be insubstantial. If the measure of awardable fees was limited by the damages received or anything like them, the lawyers would not be compensated for time necessarily spent on the

case, and most attorneys would be reluctant to undertake the representation.[4]

Thus, the defendants' proposal, which places an undue emphasis on the proportionality between the monetary verdict and the fee award unreasonably ignores the central question of § 1988: how much in fees is reasonably necessary to permit individuals whose civil rights have been violated to obtain attorneys who will diligently and competently work to preserve their rights, even if the monetary award may be moderate? The defendants' position would prevent plaintiffs' counsel from being compensated for any hours reasonably expended in recovering damages in amounts that fairly measure the plaintiff's economic injury, would require that attorneys be compensated well under the market rate for similar legal services, and would, in effect, compel many victims of civil rights violations to forgo their rights to redress entirely.

---

[4] Because only one plaintiff in this case received an award of actual damages while two recovered only nominal damages, it is possible that, in other circumstances, the fee award might be reduced to some extent to account for hours spent pursuing the two comparatively unsuccessful plaintiffs. *See Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983). Such a reduction would be inappropriate in this case for several reasons, however. First, the defendant has not suggested that a reduction should be made on this basis and thus waived the issue. Second, since the plaintiffs' claims have identical factual and legal bases, it is unlikely that any significant amount of time spent pursuing the claims of the nominal damages plaintiffs was not also necessary to advance the more successful plaintiff's claim. Third, plaintiffs who receive nominal damages are still prevailing parties entitled to fees under the statute unless their victory was merely technical or de minimis, *see Farrar*, 506 U.S. at 113–14, and as explained earlier, the important public benefits achieved in this case preclude the plaintiffs' victory from being considered merely technical or de minimis.

As the Supreme Court has repeatedly stated, there is a strong presumption that the lodestar—the amount of hours reasonably expended on a case multiplied by a reasonable hourly rate—is a reasonable fee sufficient to attract competent attorneys. *See, e.g.*, *Perdue*, 559 U.S. at 552; *Delaware Valley*, 478 U.S. at 564–65; *Stenson*, 465 U.S. at 897. Defendants' proposed rule entirely ignores this lodestar based on a misguided sense of "proportionality." If we were to adopt this untenable position, only attorneys who are either totally selfless or remarkably privileged would be able to expend the necessary, unpaid effort to advance these important rights, including attorneys whose employment at large corporate law firms allows them to dedicate a portion of their working hours to these causes *pro bono*. We are grateful for their contributions, but that is not the system envisioned by § 1988. The rule urged by defendants would eviscerate that statute. For this reason, I concur.